Scott Pactor SBN#216629
LAW OFFICES OF SCOTT PACTOR
9150 Wilshire Blvd. #175
Beverly Hills, CA. 90020
Phone: (619) 804-3242
Fax: (619) 260-0058

Attorney for ROY CAREY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| United States of America,<br>Plaintiff,<br>vs.<br>ROY CAREY Defendant. | Case No.: 25cr189-SSS<br>Date: 7/31/26<br>Time: 10 AM<br><br>**SENTENCING MEMORANDUM** |

**TO: Bill Essayli, First Assitant United States Attorney for the Central District of California and Stephen T. Merrill, Assistant United States Attorney**

Please be advised that Mr. Carey, by and through counsel will ask the court to issue an order granting the motion listed below.

## **Motion**

The accused, Roy Carey, by and through his attorney, Scott Pactor, hereby files the attached motions based on the attached memorandum of points and authorities

1. Sentencing Memorandum

Dated this 27th June 2026

/s Scott Pactor

Scott Pactor
Attorney for
Roy Carey

//

//

//

//

//

//

//

//

//

//

Scott Pactor SBN#216629
LAW OFFICES OF SCOTT PACTOR
9150 Wilshire Blvd. #175
Beverly Hills, CA. 90020
Phone: (619) 804-3242
Fax: (619) 260-0058

Attorney for ROY CAREY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| United States of America,<br>Plaintiff,<br>vs.<br>Roy Carey<br>Defendant. | Case No.: 24cr189-SSS<br><br>**SENTENCING MEMORANDUM** |

I.

INTRODUCTION

The Court has an opportunity to break the cycle of incarceration without rehabilitation that has marked Mr. Carey's adult life. This opportunity lies in the ability to supervise both Mr. Carey and his wife, with the help of probation. Mr. Carey is motivated to improve his life while he serves his sentence, and when he gets out, so that he can help raise his children in a way his father never did. He requests a sentence of 48

months based on the 3553 factors detailed below. Mr. Carey suggests that the proper guideline range in this case is 19, Criminal history Category VI, Guideline range of 63 to 78 months.

Mr. Carey faced long odds from the start, during a childhood where he was exposed to drugs, violence and economic instability from birth. When he began school he was bullied for being poor, and was quickly shuttled into the school to prison pipeline. As an adult he has struggled to establish himself while grappling with a substance abuse disorder that started in childhood, and with an utter lack of resources to help him succeed. The response of the State of California has been to lock him up without even trying to provide the support he lacked from his family as a child and adult. With the help of the Court, Mr. Carey hopes he can begin to walk a different path after he has served his custodial sentence. This is his story.

## II.

## Mtigating Factors

Mr. Carey urges the Court to consider the mitigating factors in his case. Those factors include:

- Chronic childhood neglect, homelessness, and housing instability
- Exposure to and normalization of parental substance dependence and criminal activity from an early age
- Early exposure to violence, including stabbings and assaults
- Pre-adolescent substance use

- History of childhood sexual victimization and trauma
- Early institutionalization and gang involvement in the absence of stable, protective systems
- Demonstrated ability to obtain and maintain lawful employment over extended periods
- Strong work ethic and consistent motivation to provide financial support for his family
- Documented leadership skills, reliability, and responsibility in employment settings, even when struggling with substance dependence
- Demonstrated insight into the impact of his action on his wife and children
- Emotional attachment to his children and expressed commitment to improve as a father and partner
- Expressed willingness to engage in rehabilitative programming and supportive
- Open to treatment, personal growth, and accountability
- Demonstrated capacity for sustained effort and perseverance when provided with structure and opportunity

### A. Mr. Carey had a Horrific Childhood that Set Him Up for a Life Ensnared in the Criminal Justice system

Roy Carey was born on April 13, 1988 in Modesto, California. His mother, Margaret "Mary" Tomlinson and father, David Dwayne Carey, separated before his birth. Roy is the first of two biological children. His sister, Krista Carey, was born in 1989. When Roy was around 10 years old, his mother took in two abandoned boys, Jaime (born in approximately 1988) and David (approximately 1986), who Roy still identifies as brothers. Roy never lived with his biological father. According to Roy's paternal grandmother, Shirley Carey, Roy's father struggled with chronic substance dependence

throughout Roy's childhood and adult life and was frequently homeless. Roy recalled visiting his father in abandoned houses and under bridges during his childhood. He estimated that they saw his father once or twice per year growing up, but in some cases they lived near him and saw him more often.

During visits with his father, Roy was directly exposed to his father's drug use and paraphernalia. Roy remembered his father openly using drugs in front of the children and seeing needles and syringes in plain sight. Roy stated that his father did not provide financial support for the family.

Roy described his mother as caring, generous, and affectionate. At the same time, her lifelong substance dependence substantially impaired her ability to provide supervision, stability, and consistent caregiving. According to Roy, his mother's addiction began before his birth and continued throughout his upbringing and to the present day. Roy recalled that his mother prioritized the immediate demands of addiction over her children. However, he spoke about his mother with compassion and never doubted her love for him or his siblings.

When Roy was approximately seven or eight years old, his mother entered a relationship with a man she later married. Roy described his stepfather as heavily involved in drug use and drug sales and stated that he was repeatedly incarcerated throughout Roy's childhood. Although Roy denied physical abuse by his stepfather, the

repeated incarcerations, criminal activity, and normalization of substance use contributed to instability within the household.

**B. Housing Instability, Poverty, and Neglect**

Roy's childhood was characterized by chronic poverty and housing instability. His mother worked as a hairdresser while his stepfather was unemployed. Roy reported that the family moved frequently between Pomona, Upland, and Montclair, California.

Although the family occasionally secured apartments, they were repeatedly evicted due to financial instability and substance use. Roy recalled that the longest period of housing stability he experienced lasted approximately two years, when the family lived in an apartment complex managed by his maternal grandmother. Outside of this period, the family frequently stayed in motels, vehicles, abandoned homes, and temporary living arrangements with friends.

Roy identified homelessness as the most painful aspect of his childhood. Even at a young age, he experienced persistent worry about his family's housing situation and described feeling responsible for helping his family survive.

Roy reported that his paternal grandmother provided critical support throughout his childhood. She regularly purchased clothes and school supplies for the children and sometimes provided money to help the family pay for motel rooms when the family lacked housing. However, his paternal grandmother reported that there were periods

when the family was out of contact. Roy described his mother's parenting style as largely hands-off due to her own struggles. He reported being left unsupervised and largely responsible for himself from an early age. Roy described his childhood as one of almost total independence and stated that he often "ran wild" with his friends because of the lack of supervision at home. His mother would sometimes leave the children alone while she used drugs. Roy recalled waking up alone in the middle of the night, comforting his younger sister, and waiting for their mother to return.

Roy also experienced food insecurity. He recalled times when he would open the refrigerator to find there was no food. He remembered making a mixture of peanut butter and sugar for himself and his younger sister because there was little else to eat.

The chronic instability, lack of supervision, and unmet basic needs Roy experienced contributed to the early normalization of survival-oriented behavior.

**C. Exposure to Substance Abuse, Crime, and Violence**

From an early age, Roy was surrounded by substance use, criminal activity, and violence. He regularly found pipes, syringes, and other drug paraphernalia within the home. Roy recalled repeated police raids at their places of residence throughout his childhood. He described these raids as terrifying and remembered hiding when officers entered the home. Roy stated that on multiple occasions, his stepfather, and sometimes his mother, were arrested and taken to jail. On one occasion, Roy's mother was incarcerated for approximately three weeks, during which Roy and his sister stayed with

their grandmother. Roy also described growing up in environments characterized by violence and unpredictability. He reported witnessing robberies, shootings, stabbings, and domestic violence from an early age. Roy reported that these experiences became so common that he came to see violence and crime as a normal part of life.

**D. Developmental Years and Adolescence: Education**

Roy described school as difficult. He recalled feeling chronically angry and distrustful of authority figures, and he was often in trouble. According to Roy, much of his anger stemmed from the instability and chaos of his home environment. He explained that he struggled to regulate his emotions and often acted out at school. While in the fifth grade, Roy became involved in a physical altercation with another student. During the altercation, he was struck in the eye with a rock, permanently blinding him in his left eye.

Roy recalled feeling misunderstood and targeted by school staff, including a principal who repeatedly punished him by refusing to allow him to attend recess. Although Roy struggled in school, he remembered a sixth grade teacher who took an interest in him and encouraged his academic abilities. Roy described receiving a "Star Student" award as one of the few moments during childhood in which he felt recognized positively. Although Roy struggled academically and behaviorally in school, he mentioned enjoying history and continues to express interest in that subject.

As Roy entered adolescence, he became increasingly disengaged from school. He reported frequent suspensions, chronic truancy, and eventual withdrawal from school during approximately the tenth or eleventh grade. Roy does not have his high school diploma or GED and denied any diagnosed learning disabilities. He looks forward to using his time in custody to complete his GED.

**E. Early Independence**

Throughout childhood and adolescence, Roy reported feeling emotionally older than his peers and acutely aware of his family’s financial struggles. He recalled persistent worry about motel costs and his mother's ability to support the family.

At approximately age 10 or 11, Roy began collecting copper to earn money. By approximately age 14, he obtained construction work through the father of a friend, who he said taught him the value of a strong work ethic. Roy worked intermittently in construction throughout adolescence and early adulthood. Roy described these experiences as meaningful and recalled feeling pride in earning money and contributing to his family’s ability to pay for motels.

**C. Juvenile Justice Involvement**

By adolescence, Roy had already experienced years of exposure to criminal activity and incarceration within his family system. Throughout his childhood, his stepfather was repeatedly incarcerated for drug-related offenses. Roy recalled that his stepfather often glorified incarceration and portrayed jail as exciting and a status symbol.

According to Roy, his stepfather contributed to his perception that incarceration was "cool."

Roy reported becoming involved with gangs at approximately age 13. He attributes this involvement in part to homelessness, instability, and his desire for belonging. Roy began engaging in theft and low-level drug sales. Roy emphasized that he did not have to learn these behaviors because they were so ingrained in his community, stating, "that's just what you did where I grew up."

Roy's first juvenile justice system involvement occurred around age 12 or 13 following an arrest for tagging. He was subsequently placed in juvenile hall for approximately four to five months.

Roy reported that after this first incarceration, he continued to cycle in and out of juvenile detention throughout his teenage years. At the age of 15, upon being released from another incarceration at juvenile hall, Roy attempted to reengage with school and enrolled in Hillside High School, a continuation school in Upland, California. He reported that this was the first period in years during which he consistently attended classes.

However, Roy remained deeply affected by the instability, trauma, and other influences that shaped his childhood. By age eighteen, he was sentenced to prison. Roy asked the court for the opportunity to attend Job Corps after seeing his older brother

thrive after involvement in the program. Roy remembered wanting an opportunity to find a vocational pathway. Instead, Roy entered prison. In the absence of stable support systems, treatment, educational, or vocational training, Roy became further embedded in gang culture and institutionalized survival behaviors.

**F. Employment**

When Roy was released from prison at the age of 22, Roy returned to construction work through the same friend's father who had employed him as an adolescent, demonstrating his reputation as a reliable and hardworking employee. During this period, he worked various warehouse and construction-related jobs. While he initially went through a period of homelessness, he was able to secure stable housing. Roy reported that after one stable job ended, he returned to drug sales out of financial distress.

Following his release from prison in 2009, Roy actively sought out legitimate employment. He reported attending close to 100 job interviews before eventually obtaining work through his brother Jaime's connection to an epoxy flooring company. Roy learned waterproofing and epoxy flooring systems and developed a reputation for reliability and a strong work ethic. Over time, he advanced into increasing levels of responsibility.

In approximately 2021 or 2022, Roy began employment with Superior Systems in Lake Elsinore, California, a family-owned construction and flooring company. Roy continued to work at Superior Systems until the arrest that led to his current

incarceration. Roy described this job as a major source of personal pride and identity. He recalled feeling proud of his persistence, craftsmanship, and ability to support his family through skilled labor.

According to employer Gunner Lee, Roy distinguished himself through his reliability, initiative, and willingness to learn. Mr. Lee stated that Roy advanced from journeyman-level work into leadership responsibilities that included supervising crews, coordinating projects, and communicating with superintendents.

Mr. Lee described Roy as one of the hardest-working employees the company had employed. He emphasized Roy's willingness to work long hours, to respond to urgent projects, independently research materials and techniques prior to assignments, and continually improve his technical skills. According to Mr. Lee, Roy demonstrated respect toward coworkers, particularly older employees, who he treated with patience and respect. Mr. Lee emphasized that he would hire Roy back "in a heartbeat."

Roy's employment history reflects a pattern in which prior employers repeatedly offered him work, even following periods of incarceration and legal entanglement. The willingness of former employers to reemploy Roy despite his criminal history suggests that those who worked closely with him consistently viewed him as dependable, hardworking, teachable, and capable of earning trust over time. This pattern indicates

that, when provided structure and meaningful opportunity, Roy possesses substantial capacity for responsibility, productivity, leadership, and prosocial functioning.

G. **Mental and Physical Health**

Roy's life history reflects repeated exposure to trauma beginning in childhood and continuing throughout adolescence and adulthood. In addition to chronic neglect and instability, Roy survived multiple violent assaults. In the fifth grade, he was hit in the left eye with a rock, causing permanent blindness in that eye. At approximately age 14, he was stabbed by a group of older boys and sustained a serious arterial injury that required hospitalization. At approximately age 22, Roy was stabbed again in an incident related to gang politics while incarcerated. Roy recalled that this event significantly altered his perception of gang affiliation and loyalty. Later that same year, Roy witnessed a close friend being fatally stabbed at a party and recalled holding his friend while he died. Roy reported multiple head injuries associated with assaults and substance-related incidents. Roy has high blood pressure for which he is prescribed medication, which he takes inconsistently. He also reports headaches, sleep disturbance, racing heartbeat, and sweating episodes. Roy currently takes Suboxone to assist with opioid withdrawal symptoms and reports experiencing depressive side effects. Roy remains permanently blind in his left eye. He wears dark glasses to protect his sight in his remaining eye. Roy described persistent stress-related symptoms, including chest tightness, racing thoughts, sweating, sleep disturbance, and chronic anxiety. He stated that incarceration has

intensified these symptoms and described prison as psychologically damaging. Roy manages stress through exercise, contact with his wife and children, and by speaking with supportive peers.

**H. Substance Use History**

Roy's substance use began during pre-adolescence and evolved into a persistent pattern of substance dependence. By approximately age 11 or 12, Roy was drinking alcohol heavily and smoking marijuana with peers. Roy stated that being intoxicated provided an emotional escape and temporary relief from painful emotion

During adolescence, Roy experimented with various substances. He tried methamphetamine but reports disliking it and discontinuing his use of it. At around age 15, he used crack cocaine and he also reports occasional use of stimulants such as speed. Although he states that he initially did not like pills, his substance use escalated over time to include regular use of alcohol, marijuana, opioids, and other drugs.

Roy recalled openly using substances around his parents without intervention or consequences. According to Roy, substance use within the household was normalized.

Roy states that his mother and stepfather did not respond when he used drugs at home. He recalls openly smoking marijuana, using hallucinogens, and being intoxicated in front of his parents without intervention or consequences.

Roy reported first using heroin while incarcerated, and describes becoming addicted thereafter. He explained that his heroin use was cyclical and tied to opioid availability: if he could obtain pills, such as OxyContin, he would use those instead, but when pills were unavailable, he returned to heroin.

Roy estimated that he first used fentanyl in the past two or three years. He described fentanyl as significantly more destabilizing and destructive than prior substances. He discussed the increasing financial burden of addiction and explained that despite attempts to maintain employment and support his children, addiction increasingly dominated his life.

Roy also described multiple attempts to achieve sobriety. He recalled periods of significant withdrawal symptoms while attempting detoxification and reported achieving intermittent periods of sobriety that lasted approximately six months to one year.

According to Roy, relapse most commonly occurred during periods of emotional distress, environmental stressors, or exposure to certain individuals associated with prior drug use. Roy’s substance dependence appears to be connected with his emotional dysregulation and lack of positive coping strategies to manage stress and psychological distress.

**I. Adult Relationships, Parenting, and Family**

Roy has had two significant long-term romantic relationships. He met Courtney, the mother of his first child when he was approximately 18 years old. The relationship ended while Roy was incarcerated. Roy reports that his daughter, Heaven, age 17, was born while he was incarcerated. Heaven currently lives with her mother. While Roy and his current wife initially had a strong relationship with Heaven and amicable co-parenting relationship with Courtney, dynamics changed when Courtney married to a man who did not want Courtney or Heaven to have contact with Roy. The last time Roy saw Heaven was approximately two years ago.

In 2009, Roy met his current wife, Natalie. According to Roy, both he and Natalie experienced traumatic childhoods and challenges with substance dependence. Roy acknowledged that their relationship has experienced significant conflict and instability, including heated verbal disputes and emotional dysfunction. He accepts responsibility for behaviors that have negatively affected the relationship, including infidelity, substance involvement, and the impact of incarceration on the family.

At the same time, Roy was adamant that he and Natalie are an incredible team when they are both healthy. He described Natalie as determined, capable, resilient, and fiercely protective of their children. Natalie described Roy as hardworking and

supportive. Roy expressed interest in couples counseling and stated that he would like the opportunity to determine how to develop a healing and stable relationship with Natalie.

Roy and Natalie have two children, Roy Jr. (13) and Nathan (10). Roy has also helped to raise Natalie's son, Robert (17). Robert currently lives with Natalie's mother. Roy stated that Robert has Klinefelter syndrome and Nathan is diagnosed with autism. According to Natlaie, the children's developmental and medical needs have placed additional emotional and practical demands on the family.

Roy loves being a father and takes great pride in his kids. Natalie described Roy as a dedicated and loving father whose children adore him. Roy fondly recalled taking his children on walks, riding dirtbikes, and going on trips to the Aquarium of the Pacific and to see Aztec ruins with them. He expressed remorse for exposing them to verbal disputes between himself and his wife and for the way his substance use has negatively impacted his family

**J. Protective Factors and Rehabilitation**

Despite extensive childhood adversity, substance dependence, and institutional involvement, Roy has demonstrated multiple protective factors and indicators of rehabilitation potential. He is hardworking and has demonstrated the ability to maintain lawful employment over extended periods of time, consistently reporting to work even during the most severe periods of his substance dependence. Multiple employers have

rehired him or expressed willingness to reemploy him despite his criminal history and legal involvement, suggesting that those who worked closely with Roy consistently experienced him as dependable, capable, and trustworthy.

Roy also maintains a strong emotional attachment to his wife and children. He expressed significant pride in his children and repeatedly emphasized his desire to positively influence their development and provide them with greater stability than he experienced during his own childhood. Natalie also attested to Roy's deep commitment to his children's character. Roy also expressed his own desire to be the best man he can be. As he reflected on challenges his son Roy Jr. is experiencing at school, he expressed his interest in taking parenting classes to continue to grow in his ability to shape his children to give them the best chance of success in life.

Additionally, Roy demonstrates insight into the harm caused by his substance dependence, instability, and incarceration. He expressed strong interest in rehabilitative programming, including substance abuse treatment, individual therapy, couples counseling, and vocational training, opportunities he reported he has never received.

Roy has also experienced periods of sobriety lasting from approximately six months to one year. His history of sustained employment, emotional investment in his family, demonstrated work ethic, and expressed motivation for treatment suggest

meaningful potential for rehabilitation when provided appropriate structure, support, and intervention.

**K. Conclusion**

Roy Carey's developmental history reflects persistent exposure to neglect, trauma, addiction, violence, and instability beginning in early childhood. Many of the behaviors and coping mechanisms that later contributed to criminal conduct emerged in environments where substance use, incarceration, and survival-based behavior were normalized and where meaningful intervention was largely absent.

At the same time, Roy's history also reflects repeated efforts toward lawful employment, family attachment, and personal growth. Interviews from employers and family members demonstrate that Roy possesses substantial strengths, including resilience, work ethic, leadership ability, loyalty to family, and the capacity to function responsibly when provided structure and opportunity.

A sentence that prioritizes treatment and therapeutic intervention would directly address the root causes of Roy's conduct and offer the strongest chance for rehabilitation, public safety, and long-term success.

From childhood he has received little or no support, only repeated periods of incarceration. Perhaps it is time for someone to give him the chance to do better. He is requesting a sentence of 48 months with a recommendation for the RDAP program.

.

Respectfully Submitted,

Dated: June 27th, 2026

/s Scott Pactor
Scott Pactor
*Attorney for*
*Roy Carey*